**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**
**FERGUS FALLS DIVISION**

RONALD C. JAMES and
KORY JAMES

       Civil Action No.: <u>6:21-cv-00629</u>

      Plaintiffs,

**v.**

       **COMPLAINT AND DEMAND**
       **FOR JURY TRIAL**

FORD MOTOR COMPANY and
KEN GRODY REDLANDS, LLC.,

      Defendants.

## <u>PLAINTIFFS' ORIGINAL COMPLAINT</u>

### PARTIES

1.    Plaintiffs Ronald C. James and Kory James are citizens of Minnesota.

2.    Defendant Ford Motor Company ("Ford") is a Delaware corporation with headquarters in Michigan. Ford can be served with summons through its registered agent, C T Corporation System, Inc., 1010 Dale Street North, St. Paul, Minnesota 55117-5603.

3.    Defendant, Ken Grody Redlands, LLC d/b/a Ken Grody Ford Orange County ("Ken Grody Ford"), is a California limited liability company. Ken Grody Ford does not maintain a registered agent in Minnesota and may be served with summons through its registered agent, Corporation Service Company, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California 95833.

### JURISDICTION AND VENUE

4.    This Court has diversity jurisdiction over the claims in this Complaint according to 28 U.S.C. § 1332(a)(1) as the amount in controversy exceeds the sum or value of $75,000.00 and it is a controversy between diverse citizens of different states.

5.      Venue is proper in the Fergus Falls Division pursuant to 28 U.S.C. § 96 and 28 U.S.C. § 1391 because the crash, and thus a substantial part of the events or omissions giving rise to the claim, occurred in Hubbard County, Minnesota.

6.      In support of a motion to transfer this case out of its home state of California, Ken Grody Ford signed a formal, written stipulation to personal jurisdiction in Minnesota.

7.      Ford has consented to jurisdiction in Minnesota by registering an agent for service of process under Minnesota Statute § 303.10.

8.      Ford has appointed an agent for accepting service of process in Minnesota.

9.      Ford has registered to do business in Minnesota under Minnesota Statutes § 303.

10.     Ford has employees in Minnesota.

11.     Ford has franchises in Minnesota.

12.     Ford has more than 70 authorized dealerships in Minnesota.

13.     Ford collects data from its dealerships in Minnesota for use in redesigns and repairs.

14.     Ford has certified mechanics in Minnesota.

15.     Ford pays taxes to the State of Minnesota in connection with sales of F-350 trucks.

16.     Ford owns more than $1,000,000 worth of real property in Minnesota.

17.     For each of the past five years, Ford has spent more than $250,000/year to purchase advertisements on broadcast television stations that are based in Minnesota and that serve television markets that consist of only counties in Minnesota.

18.     For each of the past five years, Ford has spent more than $250,000/year to purchase advertisements for the Ford F-series on broadcast television stations that are based in Minnesota and that serve television markets that consist of only counties in Minnesota.

19.     Ford has paid for television advertisements for the Ford F-350 model of pickup truck on broadcast television affiliates based in Minnesota and that serve television markets that consist of only counties in Minnesota.

20.     Ford paid for television advertisements for the 2003 Ford F-350 model of pickup truck on broadcast television affiliates based in Minnesota and that serve television markets that consist of only counties in Minnesota.

21.     Over the past decade, Ford has spent more than $200,000 to advertise the F-350 model of pickup truck on broadcast television affiliates based in Minnesota and that serve television markets that consist of only counties in Minnesota.

22.     Ford designed and built the "Northland Edition" F-150 as a regional product specifically directed at Minnesota, Iowa, Wisconsin, Nebraska, and the Dakotas.

23.     Ford's advertising includes direct mail advertisements to Minnesotans.

24.     Ford's marketing in Minnesota includes a 2016 "Ford Experience Tour" in Minnesota, a 1966 Ford Mustang built as a model car for the Minnesota Vikings, a "Ford Driving Skills for Life Free National Teen Driver Training Camp" in Minnesota, and sponsorship of multiple athletic events in Minnesota.

25.     The Ford F-series has been the #1 or #2 most-sold light truck model in Minnesota for each of the past five years.

26.     For each of the past 10 years, Ford has sold more than 50,000 vehicles/year in Minnesota.

27.     Ford sold more than 2,500 of the 2003 Ford F-350 model of pickup truck to Ford authorized dealerships in Minnesota.

28.     200,000 vehicles sold at an average price of $10,000 apiece equals $2 billion in gross sales.

29.     Over the past decade, Ford's gross sales of vehicles in Minnesota have exceeded $5 billion.

30.     More than one third of Ford's total sales in Minnesota over the past decade have been of F-series trucks.

31.     All Minnesota Ford dealerships collect and contribute information to the systems which have variously been known as FMC360, FORDSTAR, OASIS, and CQIS. These interactive databases collect information concerning Ford vehicles which arrive at Ford service departments.

32.     Ford's Critical Concern Review Group determines whether design and manufacturing issues raise a safety concern based upon information collected by Ford's databases, which includes vehicle data gathered from Minnesota dealerships through Ford's Global Common Quality Indicatory System.

33.     These databases are part of Ford's efforts at post-market surveillance of Ford products in an effort to ensure Ford understands, detects, and corrects unreasonably dangerous designs.

## FACTUAL BACKGROUND

### Ford knows the risks and harms of pickup truck rollovers

34.     While rollovers represent a small (but rising) number of total crashes, they are the biggest killers in light trucks and SUVs.

35.     Injuries in rollovers can result from roof crush into the occupant's survival space, leading to an occupant's "second" collision with structures and components within the vehicle.

36.     The forces generated by most rollovers are well within human tolerance if the occupant is properly restrained and the roof does not crush significantly into the occupant compartment.

37.     Rollovers become dangerous when defects in the vehicle – for instance, weak roofs or ineffective restraints – place the occupant at risk.

38.     A July 8, 1968 memo from Ford's Automotive Safety Research Office (the "Memo") states that "Roof instruction may have a more pronounced effect on occupant injuries with increased usage of upper torso restraints."

39.     The Memo also states that "People are injured by roof collapse. The total number of nationwide deaths and injuries cannot be estimated but it is a significant number."

40.     The Memo further states that "It seems unjust to penalize people wearing effective seatbelt restraint systems by exposing them to more severe rollover injuries than they might expect with no restraints."

41.     In hearings before the U.S. Senate, Ford President Arjay Miller testified that: "We have been contributing to the Cornell crash study program since 1955. This is the only source of mass statistics on injuries resulting from auto accidents, and we make extensive use of the data."

42.     One observation from the Cornell program known as the Automotive Crash Injury Research Committee ("ACIR") was: "This Research Center has gathered injury data which freely demonstrates that approximately 19% of all injury-producing accidents involve a roll-over type accident. Crushing of the top structure is also a serious problem as this effectively destroys the package compartment, leaving no room for the occupant."

**Ford makes the F-350 with an unsafe, too-weak roof**

43.     Ford is capable of making roofs that are strong and maintain their integrity in rollovers.

44.     On March 21, 2001, Ford VP of Environmental and Safety Engineering Helen Petrauskas testified that "We have a moral obligation to do those things that are feasible and practical to reduce the risk of injury and death to customers."

45.     On May 23, 2006, Ford engineer Thomas Patterson testified that "The technology's always been available to build as rigid a roof structure as you want."

46.     The 2003 F-350 is not designed in such a way that injuries to its occupants are minimized during foreseeable rollover crashes.

47.     Because the roof of the 2003 F-350 is not strong enough to support the weight of the vehicle, it collapses into occupants' survival space.

48.     The following technologically and economically feasible methods are and have been available to Ford to improve the roof strength of all of its vehicles, including F-350s:

- Using closed structural sections in place of weak, shallow-tray open sections;
- Increasing metal gauge;
- Replacing low-strength steel with high-strength steel (e.g., Boron steel is five times stronger than conventional steel);
- Reinforcing component voids with structural foam;
- Increasing section size;
- Implementing internal reinforcements;
- Eliminating holes; and
- Improving component integration.

49.     Ford failed to exercise sound engineering judgment in its design of the F-350's roof. Instead of using available safety technology to ensure it was safe in a rollover, Ford chose only to comply with minimum requirements.

50.     Ford's choice was made consciously and in an effort to avoid the time, money and effort necessary to strengthen the roof to withstand the foreseeable forces of real-world rollovers.

51.     Ford was also negligent in failing to test the F-350's injury prevention and occupant protection capabilities through dynamic rollover testing, which would provide performance data on how the roof structure and restraints perform under real-world conditions.

### The subject sale and subject crash

52.     Ford designed the 2003 F-350 bearing VIN 1FTSW31P63ED08270 (the "F-350").

53.     Ford manufactured the F-350.

54.     Ford marketed the F-350.

55.     Ford sold or transferred the F-350 through a distribution chain that resulted in the F-350 becoming available for purchase by consumers at Ken Grody Ford.

56.     Ronald James bought the F-350 from Ken Grody Ford.

57.     Ken Grody Ford was an authorized Ford dealership when Ronald James bought the F-350.

58.     Ken Grody Ford is still an authorized Ford dealership.

59.     Ronald James registered the F-350 in Minnesota in 2006.

60.     On March 19, 2020, Ronald James was driving the F-350 in Hubbard County, Minnesota.

61.     The F-350 rolled passenger side with six quarter turns and came to rest on its roof.

62.     The roof on the F-350 collapsed in the crash.



63.     First responders found Ronald James trapped and belted inside the upside-down F-350.

64.     Ronald James reported to first responders that he was unable to feel his legs.

65.     First responders transported Ronald James to CHI St. Joseph's Health Hospital, where he was found to have suffered a cervical spine fracture and paralysis.

66.     As a result of the crash, Ronald James sustained acute complete cord injury, including three column fracture dislocation with ligamentous disruption at C6-C7 level and bilateral subluxation of facets with grade 2 anterolishthesis of C6 over C7 with ASIA A Cord injury.

67.     Roof deformation pattern-imposed head constraint producing cervical spine buckling kinematics at C6-C7 followed by compression-flexion loading pattern by subsequent roof deformation into the survival space causing severe narrowing of AP canal diameter.

68.     Mr. James' head was pocketed above his seat position by the roof deformation pattern.

69.     The buckling kinematics of Mr. James' lower cervical spine and subsequent excessive roof intrusion produced his fracture dislocations.



70.     Mr. James' spinal cord was dynamically pinched due to the reduction of AP canal diameter during the fracture dislocation.

71.     Poor restraint performance allowed Mr. James head to impact the roof.

72. Poor roof strength and intrusion into the survival space produced flexion-compression of Mr. James' buckled spine.

73. Ford's roof and rollover protection systems for the F-350 failed to:

    a. Limit the head excursion towards the roof.
    b. Prevent roof/headliner distortion capable of pocketing the head.
    c. Prevent roof intrusion into the survival space.

74. Had the subject 2003 F-350 been equipped with a stronger roof and effective rollover restraint, Mr. James would have walked away from the subject incident without spinal cord injury.

75. The catastrophic injuries to Ronald James occurred because the F-350's roof and rollover protection system were defective. Ronald James' safety was severely compromised by the poor performance of the F-350's roof structure in the rollover at issue.

76. The negligence of Defendants was a proximate cause of the injuries to Ronald James and Plaintiffs' resulting damages.

## CAUSES OF ACTION AGAINST FORD

### STRICT PRODUCTS LIABILITY

77. Plaintiffs incorporate by reference each and all of the allegations contained in the preceding paragraphs as though fully set forth herein.

78. This is, in part, a product defect and crashworthiness case with respect to the 2003 Ford F-350 that was involved in the rollover.

79. The F-350's rollover protection system ("ROPS") was designed, manufactured, assembled, marketed and sold by Ford.

80. ROPS includes: (1) the roof structure; (2) the seat belt restraint; (3) roll-activated air bags; and (4) the vehicle's glazing, including all components of these devices.

81.    The F-350's ROPS was defectively designed, manufactured, assembled, marketed and sold by Defendant Ford in that the roof is weak and collapses in rollovers, compromising the occupant survival space.

82.    The F-350's ROPS was defectively designed, manufactured, assembled, marketed and sold by Defendant Ford in that the seat belts do not couple an occupant to his seat in a rollover and instead cause occupant excursion that results in injurious interaction with the vehicle's collapsing roof structure.

83.    The defective nature of the F-350's ROPS rendered the product unreasonably dangerous taking into consideration the utility of the ROPS and the risk involved in its use.

84.    When the F-350 with its ROPS left the control of Defendant Ford, there were safer alternative designs other than those of the F-350's ROPS.

85.    The safer alternative designs would have either prevented or significantly reduced the risk of such injuries without substantially impairing the utility of the F-350 and its ROPS.

86.    The safer alternative designs were economically and technologically feasible at all times relevant. Therefore, Defendant Ford is strictly liable for the serious injuries to Plaintiff Ronald James and Plaintiffs' resulting damages.

87.    The design of the F-350 was defective and unreasonably dangerous in that the F-350 roof and ROPS failed to perform safely during the crash sequence.

88.    The design of the F-350 was defective and unreasonably dangerous in that the F-350 roof and ROPS was improperly and inadequately tested by Ford.

89.    The design of the F-350 was defective and unreasonably dangerous in that the F-350 was not crashworthy in rollovers.

90.     Information Ford collects from its authorized dealerships in Minnesota is directly relevant to Plaintiffs' design defect claim. These dealer databases in Minnesota are part of Ford's efforts at post-market surveillance of its products to try to ensure Ford understands, detects, and corrects unreasonably dangerous designs. Plaintiff alleges that Ford failed in this undertaking, and as a result, it designed and marketed a defective product which injured him.

91.     Ford knew or should have known of a potential risk of harm presented by the defective design of the F-350, but negligently marketed the F-350 with the design and marketing defects.

92.     The F-350 posed a risk of harm for the intended or reasonably anticipated use.

93.     Ford knew or should have reasonably foreseen the risk of harm at the time the F-350 was sold, and that the product possessed a marketing defect.

94.     The absence of proper warnings and/or instructions rendered the product unreasonably dangerous to the user of the product.

95.     Ford's failure to warn or instruct of the danger posed by the F-350 was a proximate and producing cause of Plaintiff's injuries and damages.

96.     Ford's defective design of the F-350 and its roof and ROPS was a proximate and producing cause of Plaintiff's injuries and damages.

97.     Ford's defective manufacturing of the F-350 and its roof and ROPS was a proximate and producing cause of Plaintiff's injuries and damages.

98.     Plaintiff was not offered or afforded proper and adequate occupant protection in the foreseeable rollover made the basis of this lawsuit.

99.     The F-350 was also improperly and inadequately tested for occupant crash safety by Ford.

100.     Plaintiff further claims, in the alternative, that a manufacturing defect was a producing cause of her personal injuries and provides notice of her intention to rely upon the Malfunction

Doctrine (also known as the Malfunction Theory) as set forth in RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 3 (1998). In this instance, it may be inferred that the severe and permanent injuries sustained by Plaintiff were caused by a product defect existing at the time of sale or distribution, without proof of a specific defect, because the injuries suffered by Plaintiff: (a) were of the kind that ordinarily occur as a result of a product defect; and (b) were not, in the particular case, solely the result of causes other than the product defect existing at the time of the sale or distribution.

101.    Plaintiff further claims that marketing defects in the product were a producing cause of Plaintiff's injuries and damages.

102.    Plaintiffs would show that Ford failed to give adequate warnings of the F-350's lack of crashworthiness through an effective ROPS.

103.    Ford failed to give adequate warnings concerning the defects in the F-350's ROPS and is therefore strictly liable for the serious injuries to Plaintiff Ronald James and Plaintiffs' resulting damages.

## NEGLIGENCE

104.    Plaintiffs incorporate by reference each and all of the allegations contained in the preceding paragraphs as though fully set forth herein.

105.    The serious injuries to Ronald James and Plaintiffs' resulting damages were proximately caused by the negligence and negligence *per se* of Defendant Ford in designing, manufacturing, assembling, marketing and selling the F-350 with a defective roof and ROPS.

106.    At all relevant times, Ford owed a legal duty to Plaintiffs.

107.    At all relevant times, Ford owed a legal duty to Plaintiffs to exercise reasonable care in designing, manufacturing, assembling, testing, marketing and selling the F-350 to be crashworthy

and free of defects and that would present an unreasonable degree of potential harm or danger to others.

108.    The negligence of Ford, including its employees, managers, vice-presidents and executives in the course and scope of their employment includes, but is not limited to, the following acts and/or omissions regarding the safety of the F-350:

     a.    Failing to adequately warn consumers of the dangerous condition of the F-350 as described more fully herein;

     b.    Failing to provide the consumers with a ROPS that is adequate to provide protection and injury prevention in foreseeable situations like this one;

     c.    Failing to properly and adequately perform tests to assess the F-350's performance and effectiveness in foreseeable situations like this one;

     d.    Choosing to disregard and ignore generally accepted principles of hazard control ("design, guard and warn") as well as its obligation to hold the safety of the public paramount;

     e.    Choosing to disregard principles of Engineering Ethics and Safety in Design as described in SAE and engineering literature;

     f.    Choosing to ignore and/or failing to properly investigate past consumer complaints and/or notices of safety issues and/or defects;

     g.    Failing to undertake appropriate system failure analysis and/or root cause analysis when information about adverse events involving the F-350 and other F-series trucks became available to the public and/or known to Ford; and

     h.    Failing to properly incorporate the principles of product safety management into the design, development, integration, manufacture, marketing, and sale of the F-350.

109.    Defendant Ford was also negligent in failing to adequately test the 2003 F-350 and its ROPS to see how they would perform in rollover crashes.

110.    Ford was negligent in choosing to disregard and ignore its obligation to hold the safety of the public paramount.

111.    A manufacturer has a duty to warn users about the potential for harm arising out of the use of its product. Ford was negligent in failing to dynamically or properly test the F-350 and its ROPS to ascertain the dangers inherent in it. This negligence resulted in a failure to warn about the vehicle's inherent dangers including the deficient rollover protection afforded by the vehicle's defective crash safety systems and roof structure. Because of Defendant Ford's negligence, consumers were denied important and material information that should have been fully disclosed by Ford. The decision to conceal information, the failure to test, and the failure to warn were each producing and proximate causes of Plaintiff Ronald James's injuries and Plaintiffs' resulting damages.

112.    Ford's negligent conduct was attributable to its employees and/or agents who, at all times relevant, were acting within the course, purpose and scope of their employment and/or agency, and with the authority, consent, approval and ratification of Defendant.

113.    As a direct and proximate result of the negligence of Defendant Ford, Ronald James sustained serious injuries and Plaintiffs have been damaged. Further, Defendant Ford's conduct was done knowingly.

**GROSS NEGLIGENCE**

114.    Plaintiffs incorporate by reference each and all of the allegations contained in the preceding paragraphs as though fully set forth herein.

115.    This is not the first time the roof of a Ford been crushed in a rollover, resulting in quadriplegia or death of a perfectly innocent Ford owner or passenger.

116.    Companies that genuinely care about safety will undertake a fair and thorough investigation and root cause analysis of each product failure event.

117.    For many years before the F-350 at issue was manufactured, the list of spinal cord injuries and deaths in Ford vehicles continued to rise as Ford owners and passengers continued to experience enhanced injuries due to roof crush injuries in rollovers.

118.    For years, Ford did nothing to stop enhanced injuries due to roof crush from happening again and again.

119.    Ford did not undertake an objective, root cause analysis of prior roof crush failure incidents involving its cars and SUVs.

120.    Each failure to undertake a proper root cause analysis of each reported roof crush failure involving cars and SUVs manufactured by Ford was a separate act of negligence.

121.    This negligent and gross negligent conduct by Ford was a proximate cause of the injuries to the Plaintiff.

122.    A proper and thorough root cause analysis of prior roof crush failures in Ford cars and SUVs would have prompted engineers and safety conscious individuals within Ford to insist that the roofs and ROPS be fortified to stop the same types of fatal and enhanced injuries from happening again and again.

123.    The obligation to learn from mistakes and analyze past failures is a duty that engineers and technical employees within an auto maker owe to customers and the public.

124.    The duty described in the immediately preceding paragraph was breached by Ford before the manufacture of the F-350 at issue.

125.    Ford's breach of the aforementioned duty was a proximate cause of the Plaintiff's injuries and it caused harm to many other occupants of Ford cars and SUVs.

126.    Plaintiff would further show that if the roof was intentionally designed to perform the way that it did in this crash, then the designer and manufacturer of the product committed acts of

intentional conduct that directly caused the severe and permanent injury to Plaintiff and others on U.S. highways.

127.    If the roof was intentionally designed to perform as it did in this crash, then the product design was substantially certain to cause death and enhanced injuries in rollover crashes. The intentional conduct resulted in a defective product design that was a producing cause of Plaintiff's spinal cord injury. Substantial certainty is tantamount to intent and allows the court to assume intent as a predicate for imposition of punitive damages.

128.    Ford engaged in acts and/or omissions that, when viewed objectively from the standpoint of Ford at the time of occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.

129.    Ford, its management, and/or employees had actual, subjective awareness of the risk involved in their acts and/or omissions, but nevertheless proceeded with conscious indifference to the rights, safety or welfare of others. These acts and/or omissions, singularly or in combination, constitute malice that proximately caused Plaintiff's enhanced injuries and damages.

130.    Because Ford's acts as described above constitute malice and gross negligence, its conduct justifies imposition of exemplary or punitive damages. Plaintiff herein sues for exemplary damages against Ford.

## CAUSES OF ACTION KEN GRODY FORD

131.    Plaintiffs incorporate by reference each and all of the allegations contained in the preceding paragraphs as though fully set forth herein.

132.    Ken Grody Ford is negligent and liable for providing incorrect factual representations regarding the F-350 upon which there was reliance and by completely failing to disclose the F-350's known product defects. Plaintiffs specifically relied upon the false and misleading

representations by Ken Grody Ford in deciding to purchase this F-350. Absent these false representations, Plaintiffs would not have purchased the F-350. Accordingly, the false representations by Ken Grody Ford were a producing and proximate cause of Plaintiff Ronald James' serious injuries and Plaintiffs' damages.

133.    Ken Grody Ford represented that the F-350 was safe and crashworthy when it was not.

134.    There was a complete failure by Defendant Ken Grody Ford to provide any warnings regarding the F-350's lack of crashworthiness in a rollover crash, which risk was known or by the application of reasonably developed human skill and foresight should have been known to Ken Grody Ford.

135.    Employees of Ken Grody Ford represented that the F-350 was safe when the truth was that the F-350 had a weak roof and lacked structural and/or safety features that prevent or mitigate injuries when rollovers occur. These misrepresentations by the employees of Ken Grody Ford occurred in the course and scope of their employment for Ken Grody Ford. The employees of Ken Grody Ford intended that these representations would be relied upon by Ronald James in making a purchase decision, and Ronald James did rely upon these misrepresentations in purchasing the F-350. Defendant's misrepresentations were a proximate and producing cause of the serious injuries to Plaintiff Ronald James and Plaintiffs' damages.

136.    Plaintiffs allege that Defendant Ken Grody Ford committed acts of omission and commission in selling the F-350 without warning of potentially dangerous aspects of the vehicle, including its weak roof and the ineffectiveness of its seat belt restraint system. Such acts or omissions, taken separately or together, constitute independent negligence.

137.    Defendant Ken Grody Ford's negligence was attributable to its employees and/or agents who, at all times relevant, were acting within the course, purpose and scope of their employment and/or agency, and with the authority, consent, approval and ratification of Defendant.

138.    The negligent acts of Defendant Ken Grody Ford were a proximate and producing cause of the serious injuries to Plaintiff Ronald James and Plaintiffs' damages.

139.    Defendant Ken Grody Ford, by and through its sale of the F-350, expressly and impliedly warranted to the public and to Plaintiffs that the F-350 was fit for the purposes for which it was intended.

140.    Plaintiff Ronald James made use of the F-350 as alleged herein and relied on the express and implied warranties, but contrary thereto, the F-350 was not fit for its intended use, rendering it unreasonably dangerous.

141.    Defendant Ken Grody Ford breached the express and implied warranties in many ways, including the failure of the F-350 to be crashworthy in a foreseeable rollover.

142.    The F-350 did not have a strong roof and was not equipped with an adequate seat belt restraint that would couple the driver to his seat throughout a foreseeable rollover event.

143.    Defendant Ken Grody Ford also breached such warranties by its failure to properly inform its customer and warn of the F-350's many defects, including lack of rollover crashworthiness.

144.    The ROPS of the F-350 was defective and unreasonably dangerous at the time the F-350 was sold by and left the possession of Defendant Ken Grody Ford.

145.    Defendant's breach of warranty rendered the F-350 unreasonably dangerous and was a proximate cause of the serious injuries to Plaintiff Ronald James and Plaintiffs' resulting damages.

146.    Further, the conduct of Defendant Ken Grody Ford was done knowingly.

## DAMAGES

### (Personal Injury – Ronald James)

147.    Plaintiffs incorporates by reference each and all of the allegations contained in the preceding paragraphs as though fully set forth herein.

148.    As a proximate result of the above acts and omissions on the part of the Defendants, Plaintiff Ronald James has suffered substantial injuries and damages for which he seeks recovery from Defendants.

149.    Plaintiff Ronald James seeks personal injury damages in amounts the jury deems to be fair and reasonable including damages for past and future physical pain and mental anguish, past loss of earnings, loss of future earning capacity, past and future disfigurement, past and future physical impairment and past and future medical care and expenses, past and future pain and suffering, and all other elements of damages available under Minnesota law for personal injuries.

### (Loss of Consortium – Kory James)

150.    Beyond the physical and mental injuries to Ronald James, the incident and resulting have affected his marriage to his wife, Kory James. Plaintiff Kory James sues to recover damages for the loss of comfort, solace, companionship, household services, and assistance that were caused by the permanent injuries to her husband.

### PRE- AND POST-JUDGMENT INTEREST

151.    Plaintiffs are entitled to recover pre-judgment interest and post-judgment interest and attorney's fees in accordance with law and equity as part of their damages herein, and Plaintiffs here and now sue for recovery of pre-judgment interest and post-judgment interest and attorney's fees as provided by law and equity under the applicable provisions of the laws of Minnesota.

## PRAYER

Plaintiffs pray that Defendants be cited to appear and answer herein, and that upon final trial, Plaintiffs recover actual, compensatory, and exemplary damages, as specified above, from the Defendants; that Plaintiffs recover cost of Court herein expended; that Plaintiffs recover the interest, both pre-judgment and post-judgment, to which Plaintiffs are entitled under the law; and for all such other and further relief, both general and special, legal and equitable, to which Plaintiffs may be justly entitled.

## JURY DEMAND

PLAINTIFFS HEREBY DEMAND TRIAL BY JURY.

Respectfully submitted,

Dated: March 4, 2021          **MESHBESHER & SPENCE, LTD.**

*/s/ Genevieve Zimmerman*
Genevieve Zimmerman (MN# 330292)
1616 Park Avenue
Minneapolis, Minnesota 55404
Tel: (612) 339-9121
Fax: (612) 339-9188
Email: gzimmerman@meshbesher.com

**THE AMMONS LAW FIRM, LLP**

Robert E. Ammons (*pro hac pending*)
Texas Bar No. 01159820
Adam Milasincic (*pro hac pending*)
Texas Bar No. 24079001
3700 Montrose Boulevard
Houston, Texas 77006
Tel: (713) 523-1606
Fax: (713) 523-4159
Email: rob@ammonslaw.com
Email: adam@ammonslaw.com

**Attorneys for Plaintiffs**